UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

JAMES R. MILLER, and
KATHY S. MILLER, individually
and on behalf of all others
similarly situated,

      Plaintiffs

v.                                    Civil Action No. 2:00-0335

EQUIFIRST CORPORATION OF WV,
a corporation, KEYCORP FINANCE,
INC. dba Key Home Equity Services,
COMMUNITY HOME MORTGAGE LLC, dba
Community Mortgage Group, and
COMMUNITY BANK OF NORTHERN VIRGINIA,

      Defendants

MEMORANDUM ORDER

This matter is before the court on the August 24, 2001, supplemental motion by Equifirst Corporation of WV ("Equifirst") to compel arbitration and to stay these proceedings pending arbitration, or, in the alternative, to dismiss.

I.  INTRODUCTION

This lawsuit arises from two loan transactions entered into in July, 1999, between the named plaintiffs, James R. Miller and Kathy S. Miller ("plaintiffs"), and defendant, Equifirst. The two loans were secured by first and second deeds of trust on

the Miller's real estate.  (Compl. ¶¶ 5-10.)  According to
Equifirst, the loan secured by the first deed of trust on the
Miller's real estate was assigned by Equifirst to defendant
KeyCorp finance, Inc. dba Key Home Equity Services ("KeyCorp").
Equifirst assigned the other loan, secured by the second mortgage
on the Miller's real estate, to Associates Financial Services
Company, Inc. ("Associates").[1]

In their complaint, plaintiffs allege that they were
"solicited by mail at their residence for a loan by the
[d]efendant Community Home Mortgage by a written representation
that Community Home Mortgage was offering a free 'mortgage
analysis and credit review' . . . 'to determine if the mortgage
you have now is the best deal possible.'"  (Complaint ¶ 4(a).)
According to plaintiffs, "[t]he solicitation further represented
that Community Home Mortgage could offer good rates and payments
because is [sic] was 'one of the largest and most secure banks in
the United States.'"  (Id.)  Plaintiffs allege that "at the time
of the solicitation said [d]efendant was working as a loan
broker, and such fact was suppressed from the [p]laintiffs.  Nor
was it in fact working as a part of the bank as represented."

---

[1]Associates was originally named as a defendant, but was
dismissed as a party from this action by order entered on
September 14, 2001.

(Id. at ¶ 4(b).)  The plaintiffs claim that they did not "receive
any statement disclosing the existence of the broker, describing
the services to be performed, the cost thereof, and the right to
cancel the broker arrangement."  (Id. ¶ 4(d).)

        Plaintiffs further allege that "Community Home Mortgage
was paid over $3,000 as a broker out of the proceeds of the
loan," and that "[u]ntil after the loan documents were signed,
[p]laintiffs had no knowledge or opportunity to gain knowledge
that broker fees and high closing costs were included."
(Complaint at ¶ 10(b) and (d).)  According to plaintiffs,
"Community Home Mortgage owed a fiduciary duty to [p]laintiffs as
broker [to] (a) disclose the broker relationship and obtain and
pursue loans with the best available terms; (b) provide them a
written agreement disclosing the services to be performed and the
total cost thereof; (c) provide them an opportunity to cancel;
and (d) disclose to them the range of options and risks."  (Id. ¶
17.)  Plaintiffs allege that "Equifirst conspired and agreed with
Community Home Mortgage to accept solicited loans on terms
favorable to [d]efendant Equifirst without regard for the
fiduciary duty between brokers and their clients and to knowingly
breach their fiduciary duties."  (Id. ¶ 18(a).)  Plaintiffs claim
that "[d]efendant Community Bank of Northern Virginia ["Community

Bank"] participated in all activities herein alleged."  (<u>Id.</u> ¶ 18(b).)  Plaintiffs also maintain that "Equifirst and Community Bank knew or had reason to know that they did not provide written documents with a detailed description of the services to be performed, with the total cost of broker services, or with the opportunity to cancel."  (<u>Id.</u> ¶ 19.)

Attached to the complaint is a copy of the solicitation received by plaintiffs from Community Home Mortgage.  (<u>See</u> Complaint Exh. A.)  At the top of that solicitation appears the name "Community Mortgage Group."  (<u>See</u> <u>id.</u>)  Immediately below that name appears the language "Exclusive Agent for Community Bank of Northern Virginia."  (<u>Id.</u>)  The solicitation states, <u>inter alia</u>, that "Community Mortgage Group can offer such outstanding programs because we are an affiliate with one of the largest and most secure banks in [the] United States, Community Bank of Northern Virginia."  (<u>Id.</u>)  The solicitation further provides that "[i]f you have good credit and feel that you have already secured a good rate and payment, chances are, Community Bank can offer you the better end of both."  (<u>Id.</u>)

Plaintiffs responded to the solicitation and, shortly before the closing, plaintiffs were telephoned and notified that the loan would be "split into two loans and that the closing date

4

could be on July 21st or 22nd at 6:00 p.m." (Complaint at ¶¶ 4(c), 5(a).) Plaintiffs claim that they were telephoned by the "lender's agent" and told to come to the McDonald's restaurant at Patrick Street Plaza in Charleston, West Virginia on July 24, 1999, at 9:00 a.m. (<u>Id.</u> at ¶ 5(b).) Plaintiffs further represent that when they arrived at McDonald's, they were presented with a "series of documents to sign by a woman in blue jeans who was in a hurry to get somewhere." (<u>Id.</u> at ¶ 7(a).)

Plaintiffs contend that the closing agent did not provide them with the requisite number of copies of documents. (Complaint at ¶¶ 8-9.) Plaintiffs also claim that "[t]he payments on the first mortgage ended up being at $809.00 per month . . . where the original first mortgage was $501 and the APR was 7.8%." (<u>Id.</u> at ¶ 10(a).) Plaintiffs claim that Community Home Mortgage "was paid over $3,000 as a broker out of the proceeds of the loan," and that "[p]laintiffs had no knowledge or opportunity to gain knowledge that broker fees and high closing costs were included," until after the loan documents were signed. (<u>Id.</u> at ¶ 10(b) and (d).) Although plaintiffs' complaint alleges that the closing on the loans occurred on July 24, 1999, and that defendants unlawfully backdated the documents to reflect a closing on July 23, 1999, evidence adduced since the

5

filing of the complaint, including testimony from plaintiff Kathy S. Miller, suggests that the documents were dated on July 23, 1999, when the closing actually occurred.  (K. Miller Depo. at 62-63, 102-106, 109-113; B. Tichenor Depo. at 17-18.)

Plaintiffs' complaint makes additional allegations concerning the inadequacies of the good faith estimates provided to plaintiffs and the inconsistencies between those estimates and the settlement statement presented to plaintiffs on July 24, 1999.  (Id. at ¶ 11.)  Finally, plaintiffs allege that defendants' representation of a "better rate" and "getting the 'best deal possible' were not true," and that defendants took no action within twenty days of plaintiffs' February 21, 2000, notice of cancellation of the transaction.  (Id. at ¶¶ 12, 14.)

On the basis of these allegations, plaintiffs assert the following claims: Count I, class claim for breach of fiduciary duty and civil conspiracy; Count II, class claim for illegal mortgage solicitation; Count III, class claim for illegal and unconscionable terms; Count IV, individual claim for unconscionable agreement; Count V, fraud; Count VI, violation of the Truth in Lending Act ("TILA"), 15 U.S.C.A. §§ 1635(a), 1632(a) and 1638(a)(5); Count VII, class claim for unfair and deceptive acts or practices; Count VIII, violation of the Equal

6

Credit Opportunity Act ("ECOA"); Count IX, unlawful debt collection; Count X, adhesive nature of compulsory arbitration form; Count XI, procedural unconscionability of compulsory arbitration clause; Count XII, substantive unconscionability of compulsory arbitration clause; Count XIII, fraudulent inducement as to defendants' arbitration clause; and Count XIV, lack of mutuality as to the arbitration clause.  (Complaint at ¶¶ 16-97.)

It is the validity of Counts X through XIV of the complaint that is at issue in Equifirst's supplemental motion to compel arbitration and to stay these proceedings, or, in the alternative, to dismiss.

## II.  ANALYSIS

### A.   Federal Arbitration Act

Defendants rely upon The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., in support of its motion to compel arbitration.  The FAA establishes a "strong federal public policy in favor of enforcing arbitration agreements," and is designed to "ensure judicial enforcement of privately made agreements to arbitrate."  See Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 217-219 (1985).

7

> Congress enacted the FAA in 1925 in order "to
> reverse the longstanding judicial hostility
> to arbitration agreements that had existed at
> English common law and had been adopted by
> American courts, and to place arbitration
> agreements on the same footing as other
> contracts."

Snowden v. Checkpoint Check Cashing, 290 F.3d 631, 639 (4th Cir.
2002) (quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S.
20, 24 (1991)).  "Underlying this policy is Congress's view that
arbitration constitutes a more efficient dispute resolution
process than litigation."  Adkins v. Labor Ready, Inc., 303 F.3d
496, 500 (4th Cir. 2002) (citing Hightower v. GMRI, Inc., 272
F.3d 239, 241 (4th Cir. 2001)).

Pursuant to the FAA, arbitration clauses in contracts
involving interstate commerce "shall be valid, irrevocable, and
enforceable, save upon such grounds as exist at law or in equity
for the revocation of any contract."  See 9 U.S.C. § 2.  "The FAA
mandates that if parties execute a valid agreement to arbitrate
disputes, a federal court must compel arbitration."  See Sydnor
v. Conseco Financial Servicing Corp., 252 F.3d 302, 305 (4th Cir.
2001).  A party can compel arbitration under the FAA if it
establishes: (1) the existence of a dispute between the parties,
(2) a written agreement that includes an arbitration provision
purporting to cover the dispute and that is enforceable under

general principles of contract law, (3) the relationship of the transaction, as evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of a party to arbitrate the dispute. <u>Am. Gen. Life & Accident Ins. Co. v. Wood</u>, 429 F.3d 83, 87 (4th Cir.2005).

In particular, "'due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration.'"  <u>Adkins</u>, 303 F.3d at 500 (quoting <u>Volt Inf. Sciences, Inc. v. Bd. of Tr. Of Leland Stanford Jr. Univ.</u>, 489 U.S. 468, 475-476 (1989)).  Moreover, federal courts must apply the FAA to arbitration agreements arising in consumer cases.  <u>See Green Tree Financial Corp. v. Randolph</u>, 531 U.S. 79 (2000) (arbitration agreement in a mobile home financing contract); <u>Allied-Bruce Terminix Co. v. Dobson</u>, 513 U.S. 265 (1995) (arbitration agreement in a residential termite protection plan); <u>Snowden</u>, 290 F.3d at 631 (arbitration agreement in loan agreement); <u>Sydnor</u>, 252 F.3d at 302 (arbitration agreement in a financing contract for home improvements).

The United States Court of Appeals for the Fourth Circuit observed in <u>Adkins</u> that "'even though arbitration has a favored place, there still must be an underlying agreement

9

between the parties to arbitrate.'"  303 F.3d at 501 (quoting
Arrants v. Buck, 130 F.3d 636, 640 (4th Cir. 1997)).  "Whether a
party agreed to arbitrate a particular dispute is a question of
state law governing contract formation."  Id. at 501 (citing
First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944
(1995)); see also Sydnor, 252 F.3d at 305 (citing First Options
of Chicago, Inc.).  "[G]enerally applicable contract defenses,
such as fraud, duress, or unconscionability, may be applied to
invalidate arbitration agreements without contravening § 2" of
the FAA.  See Doctor's Associates, Inc. v. Casarotto, 517 U.S.
681 (1996) (citations omitted).

        In this case, the documents executed by plaintiffs as
part of their loan transactions contain an agreement to
arbitrate.  Inasmuch as the loan documents were executed in West
Virginia, the court looks to West Virginia contract law in order
to determine whether plaintiffs and defendants agreed to
arbitrate the dispute at issue in this case.  See Wood, 429 F.3d
at 90 (applying West Virginia contract law to determine the
enforceability of an agreement to arbitrate, but noting that
federal courts are not bound by West Virginia law to the extent
it "fashion[s] a broad prohibition against arbitrability of
state-law claims").

B.   <u>Arbitration Provision</u>

      With respect to both loans, plaintiffs executed identical Arbitration Riders.  (<u>See</u> Equifirst's Mot. to Compel Arbitration at Exh. 1, Arbitration Riders.)  The agreements, each bearing the heading "ARBITRATION RIDER," are dated July 23, 1999, and are signed by both James R. and Kathy S. Miller.  (<u>Id.</u>.)  The relevant provisions contained therein state as follows:

> ARBITRATION OF DISPUTES.  Any claim, dispute, or controversy (whether in contract, tort, or otherwise) arising from or related to the loan evidenced by the Note, including but not limited to all statutory claims, any claim, dispute, or controversy that may arise out of or is based on the relationships which result from the Borrower's application to the lender for the loan, the closing of the loan, or the servicing of the loan, or any dispute or controversy over the applicability or enforceability of this arbitration agreement or the entire agreement between Borrower and Lender (collectively "claim"), shall be resolved, upon the election of either Borrower or Lender, by binding arbitration, and not by court action, except as provided under Exclusions from Arbitration below.
>
> This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act (9 U.S.C. Sections 1-16) and the Code of Procedure of the National Arbitration Forum in effect at the time a claim is filed.  Copies of the arbitration rules and forms can be obtained and any claims can be filed at any National

11

Arbitration Forum office, at P.O. Box 50191,
Minneapolis, MN 55404, on the World Wide Web
at www.arb-forum.com, or by calling (800)
474-2371.

This agreement to arbitrate shall apply no
matter by whom or against whom a claim is
made.  Any election to arbitrate may be made
at any time, regardless of whether a lawsuit
has been filed or not, and such party making
the election may bring a motion in any court
having jurisdiction to compel arbitration of
any claim, and/or to stay the litigation of
any claim pending arbitration.  Any
participatory arbitration hearing will take
place in the federal judicial district of the
Borrower's residence, unless a different
location is agreed to by Borrower and Lender.
At Borrower's request, Lender will advance
the first $150 of the filing and hearing fees
for any claim which the Borrower may file
against Lender.  The arbitrator will decide
which party will ultimately be responsible
for paying these fees.  All claims between
the Borrower or Lender shall be arbitrated
individually, and shall not be subject to
being joined or combined in any proceeding
with any claims of any persons, or class of
person other than Borrower or Lender.  The
arbitrator shall apply relevant law and
provide written, reasoned findings of fact
and conclusions of law.  Judgment upon the
award rendered by the arbitrator may be
entered in any court having jurisdiction.

     EXCLUSIONS FROM ARBITRATION.  This
arbitration agreement shall not apply to
rights of [sic; or] obligations under the
loan documents that allow the Lender to
foreclose or otherwise take possession of
property securing the loan, including
repossession, foreclosure or unlawful
detainer.  Nor shall it be construed to
prevent any party's use of bankruptcy or
judicial foreclosure.  No provision of this

12

>           agreement shall limit the right of the
>           Borrower to exercise Borrower's rights under
>           the Uniform Covenant labeled "Borrower's
>           Right to Reinstate".  Subject to these
>           limitations, this arbitration agreement will
>           survive the pay-off of the loan.

(Equifirst's Mot. to Compel Arbitration at Exh. 1.)  Immediately

above plaintiffs' signatures on the Arbitration Riders is the

following provision:

>           NOTICE.  WHEN YOU SIGN THIS ARBITRATION
>           RIDER, YOU ARE AGREEING THAT EVERY DISPUTE
>           DESCRIBED ABOVE MAY BE DECIDED EXCLUSIVELY BY
>           ARBITRATION.  YOU ARE GIVING UP RIGHTS YOU
>           MIGHT HAVE TO LITIGATE THOSE CLAIMS AND
>           DISPUTES IN A COURT OR JURY TRIAL OR TO
>           PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF
>           ANY CLASS OF CLAIMANTS IN CONNECTION WITH A
>           CLAIM OR DISPUTE.  DISCOVERY IN ARBITRATION
>           PROCEEDINGS IS LIMITED IN THE MANNER PROVIDED
>           BY THIS AGREEMENT AND THE RULES OF
>           ARBITRATION.  THE ARBITRATOR'S DECISION WILL
>           GENERALLY BE FINAL AND BINDING.  OTHER RIGHTS
>           THAT YOU WOULD HAVE IF YOU WENT TO COURT MAY
>           ALSO NOT BE AVAILABLE IN ARBITRATION.  IT IS
>           IMPORTANT THAT YOU READ THIS ENTIRE
>           ARBITRATION AGREEMENT CAREFULLY BEFORE
>           SIGNING THIS ARBITRATION RIDER.
>
>           BY SIGNING BELOW, Borrower accepts and agrees
>           to the provisions contained in this Rider.

(Id.)  The Arbitration Riders were not included within the body

of any other loan documents or located upon the back of any

document.  Rather, the Riders were on separate pieces of paper,

distinct from the other loan documents executed by plaintiffs.

13

(**Id.**)


C.   **Plaintiffs' Claims Concerning Validity of Arbitration**
     **Provision**


     1.   **Count X (Adhesion) and Counts XI and XII (Procedural**
          **and Substantive Unconscionability, Respectively)**


          a.   **Parties' Contentions**


               Plaintiffs allege that the Arbitration Riders amount to
a contract of adhesion inasmuch as plaintiffs do not possess
equal bargaining power with defendants.  Plaintiffs claim that
unbeknownst to them, "among the eighty plus pages of documents
that the [p]laintiffs were directed to sign at McDonald's on July
24, 1999, was a form 'Arbitration Rules'[sic]".  (Complaint at ¶¶
82, 83(a).)  According to plaintiffs, they

               did not have reason to expect that upon entering
               into this loan transaction they would be waiving
               many of their legal rights.  The [d]efendants did
               not explain that the document purported to waive
               important rights and would enable [d]efendants to
               sue [p]laintiffs in court for possession,
               foreclosure or unlawful detainer while preventing
               [p]laintiffs from using the courts to resolve
               disputes about their illegal practices, financing,
               or contract terms.

(**Id.** at ¶ 83(b).)  Plaintiffs contend that the "compulsory
arbitration form purports to" take away from consumers the

following:  (a) constitutional right to a jury trial for
significant issues; (b) right to significant damages; (c) right
to proceed under the Rules of Civil Procedure and access
essential discovery; (d) statutory right to access to court for
claims of unfair and deceptive acts and practices; (e) right to
joinder of parties or to be part of a class; (f) right to a
declaratory judgment regarding the conduct of defendants; and (g)
right to relief of class members.  (<u>Id.</u> at ¶ 84.)

        Plaintiffs further allege that inasmuch as they "had no
knowledge of this form compulsory arbitration clause or its
contents, let alone the legal ramifications of waiver of the bulk
of the consumer's legal rights," they did not knowingly and
intelligently waive the fundamental right to go to court.
(Complaint at ¶ 85.)  According to plaintiffs, defendants' knew
or should have known that plaintiffs "were unsophisticated and
unfamiliar with its [sic] notion of 'arbitration' generally and
the ramifications of a one-sided arbitration clause that deprives
consumers of any reasonable opportunity to a fair and impartial
resolution of most dispute [sic]."  (<u>Id.</u> at ¶ 86.)  It is upon
these grounds that the plaintiffs claim the arbitration provision
was not bargained for and is "adhesive and void as a matter of
law."  (<u>Id.</u> at ¶ 87.)

Plaintiffs' allegations supporting their claim of
procedural unconsionability at Count XI are similar to those
alleged in support of the adhesion claim.  (See Complaint at ¶
89.)  As to their claim of substantive unconsionability,
plaintiffs allege that the arbitration "clauses purporting to
waive the consumer's right to judicial resolution, declaratory
relief, and public proceedings are in violation of Article III,
Section 17 of the West Virginia Constitution."  (Id. at ¶ 91.)
Plaintiffs further contend that the Arbitration Riders violate
West Virginia Code § 46A-2-121(1)(b) "in that there was a massive
disparity in bargaining power and the terms are one-sided and as
a matter of law cannot be enforced."  (Id. at ¶ 92.)

In support of the supplemental motion to compel
arbitration, Equifirst argues that the Arbitration Riders are not
adhesive inasmuch as they were not buried in eighty pages of
documents nor concealed from plaintiffs on the back of a loan
document.  Rather, the Arbitration Riders were contained on
separate pieces of paper and each was signed by plaintiffs.  (See
Equifirst's Mot. to Compel Arbitration at Exh. 1, Arbitration
Riders.)  Equifirst observes that, contrary to plaintiffs'
assertions, the Arbitration Riders, which are identical, contain
an explanation of the legal effect of arbitration.  In

16

particular, the Arbitration Riders contain a provision entitled "NOTICE" which advises that, by signing the arbitration rider, (1) every dispute described within the arbitration agreement may be decided exclusively by arbitration; (2) the parties are giving up rights they may have to litigate claims and disputes in a court or jury trial; (3) the parties are giving up rights they may have to participate as a representative or member of any class of claimants in connection with a claim or dispute; (4) discovery in arbitration proceedings is limited in the manner provided in the agreement and the rules of arbitration; (5) the arbitrator's decision will be final and binding; and (6) other rights the parties would have if they went to court may also not be available in arbitration.  (Id.)  Moreover, as noted by Equifirst, the NOTICE ends with the following statement:  "IT IS IMPORTANT THAT YOU READ THIS ENTIRE ARBITRATION AGREEMENT CAREFULLY BEFORE SIGNING THIS ARBITRATION RIDER."  (Id.)  In this case, it is undisputed that plaintiffs signed the arbitration agreement immediately beneath this NOTICE provision.  (Id.) Equifirst directs the court to case law in other jurisdictions for the proposition that the overwhelming majority of authority has held that there is no duty to explain arbitration clauses. See, e.g., Adams v. Merrill Lynch Pierce Fenner & Smith, 888 F.2d 697, 701 (10th Cir. 1989); Cohen v. Wedbush, Noble, Cooke, Inc.,

17

841 F.2d 282, 287 (9th Cir. 1988); <u>Pierson v. Dean Witter</u>
<u>Reynolds, Inc.</u>, 742 F.2d 334, 339 (7th Cir. 1984).

     Equifirst also counters plaintiffs' claim that the
Arbitration Riders are "one-sided" and deprive consumers of any
reasonable opportunity to a fair and impartial resolution of most
disputes, asserting that it is not only plaintiffs who are bound
by arbitration or who are required to surrender substantive
rights.  The arbitration agreement equally binds Equifirst,
Keycorp and plaintiffs to the decision of the arbitrator.
Furthermore, with the exception of foreclosure and bankruptcy
proceedings, plaintiffs have the contractual right to force
Equifirst and KeyCorp to arbitrate all other claims they may
have, including any deficiency claims, actions on the notes, and
disputes regarding the application of payments and the imposition
of charges.  (<u>See</u> Equifirst's Mot. to Compel Arbitration at 13
and Exh. 1; Keycorp's Mot. to Compel Arbitration at 13 and Exh.
1.)

     b.   <u>Applicable Law</u>

     According to West Virginia law, "'[a]dhesion contracts'
include all 'form contracts' submitted by one party on the basis
of this or nothing." <u>State ex rel. Dunlap v. Berger</u>, 567 S.E.2d

18

265, 273 (W. Va. 2002) (citations omitted).  "[I]n a contract of
adhesion, a party's 'contractual intention is but a subjection
more or less voluntary to terms dictated by the stronger party.'"
Id. at 273 n.4.  However, a finding that a contract is one of
adhesion does not automatically render the contract
unenforceable; rather, "[f]inding that there is an adhesion
contract is the beginning point for analysis, not the end of it."
Id. at 273 (citations omitted).  Courts must "[distinguish] good
adhesion contracts which should be enforced from bad adhesion
contracts which should not."  Id.

        Conversely, a finding that a contract is
unconscionable, be it adhesive or not, necessarily renders the
contract unenforceable.  In West Virginia, procedural and
substantive unconscionability are not two distinct claims.  See
Arnold v. United Companies Lending Corp., 511 S.E.2d 854, 861,
n.6 (W. Va. 1998) ("We want to dispel the notion . . . that there
are two distinct issues termed 'procedural unconscionability' and
'substantive unconscionability,' either one of which can
invalidate a contract.")  "A determination of unconscionability
must focus on the relative positions of the parties, the adequacy
of the bargaining position, the meaningful alternatives available
to the plaintiff, and 'the existence of unfair terms in the

19

contract.'"   <u>Art's Flower Shop v. C & P Telephone Co.</u>, Syl. pt.4,

413 S.E.2d 670 (W. Va. 1992); <u>Arnold</u>, Syl. pt.4, 511 S.E.2d 854;

<u>Drake v. West Virginia Self-Storage, Inc.</u>, Syl. pt.2, 509 S.E.2d

21 (W. Va. 1998) (<u>per</u> <u>curiam</u>).

      The United States Court of Appeals for the Fourth

Circuit, affirming a decision of this court, addressed similar

arguments regarding the adhesive and unconscionable nature of a

contract under West Virginia law.   <u>See</u> <u>Adkins</u>, 303 F.3d 496.   The

representative plaintiff in <u>Adkins</u> argued that the employment

contracts signed by employees of Labor Ready, a temporary

employment agency, were unconscionable adhesive contracts due in

part to the unequal bargaining power of the employees:

> many of the plaintiffs did not complete high
> school, were paid at or near the minimum wage
> by Labor Ready, live in low-income
> neighborhoods, and did not know what
> arbitration was when they signed the
> employment application. . . . [Moreover,]
> Labor Ready is a large, sophisticated,
> international corporation.

<u>Adkins</u>, 303 F.3d at 501).[2]   Relying upon West Virginia law, the

_____

    [2]The court notes the similarity in the arguments of the
plaintiffs in this case and those of the plaintiff in <u>Adkins</u>.
The plaintiffs contend great disparity in bargaining power
between plaintiffs and defendants, focusing on the unequal
sophistication of the parties.

Fourth Circuit rejected the plaintiff's unequal bargaining power

argument, stating as follows:

> A ruling of unconscionability based on this
> analysis alone could potentially apply to
> every contract of employment in our
> contemporary economy.  The West Virginia
> courts recognize that "it is not the province
> of the judiciary to try to eliminate the
> inequities inevitable in a capitalist
> society."  Troy Mining Corp. v. Itmann Coal
> Co., 346 S.E.2d 749, 753 (W. Va. 1986).

Id.  The court noted, in light of Troy Mining, that to find an

agreement unconscionable, West Virginia law requires "both 'gross

inadequacy in bargaining power' and 'terms unreasonably favorable

to the stronger party.'"  Id. (quoting Troy Mining, 346 S.E.2d at

753 (internal citations omitted)).  However, the court further

observed that under West Virginia law,

> [a] finding "that the transaction was flawed
> . . . still depends on the existence of
> unfair terms in the contract.  A litigant who
> complains that he was forced to enter into a
> fair agreement will find no relief on grounds
> of unconscionability."  Arnold, 511 S.E.2d at
> 861 n.6 (quoting Troy Mining Corp., 346
> S.E.2d at 753.)

Adkins, 303 F.3d at 502.  The court then turned to an analysis of

the arbitration agreement in the employment contracts to

determine whether their existed any unfair terms, noting that

"'the grounds for revocation must relate specifically to the

arbitration clause and not just to the contract as a whole.'"
Id. (quoting Hooters of America, Inc. v. Phillips, 173 F.3d 933,
938 (4th Cir. 1999).

      The Fourth Circuit noted that the crux of Adkins'
challenge to the arbitration clause was based upon his assertion
that the clause foreclosed redress of his underlying substantive
rights, including access to the courts, the right to participate
as a member of a class action, and even access to arbitration due
to its high cost.  Adkins, 303 F.3d at 502.  The court disagreed
with Adkins, explaining that arbitration is a forum no less
reliable or inferior to that of the courts for vindicating
important substantive rights, and finding that Adkins' denial of
access to the courts did not foreclose redress of his substantive
rights.  Id.

      One of plaintiffs' arguments concerning the validity of
the Arbitration Riders in this case asserts that Equifirst has
reserved the right to seek redress in court, while denying the
plaintiffs the right to a judicial forum.  The relevant language
is as follows:

        EXCLUSIONS FROM ARBITRATION.  This
      arbitration agreement shall not apply to
      rights of [sic; or] obligations under the
      loan documents that allow the Lender to

> foreclose or otherwise take possession of
> property securing the loan, including
> repossession, foreclosure or unlawful
> detainer.  Nor shall it be construed to
> prevent any party's use of bankruptcy or
> judicial foreclosure.  No provision of this
> agreement shall limit the right of the
> Borrower to exercise Borrower's rights under
> the Uniform Covenant labeled "Borrower's
> Right to Reinstate".  Subject to these
> limitations, this arbitration agreement will
> survive the pay-off of the loan.

(Equifirst's Mot. to Compel Arbitration at Exh. 1.)

The West Virginia Supreme Court of Appeals addressed significantly more one-sided language favoring the lender in an arbitration clause in Arnold, 511 S.E.2d at 861, n.6.  In Arnold, United Lending Corp. ("United Lending") solicited the Arnolds for a mortgage loan.  Id. at 857.  The Arnolds borrowed money from United Lending and executed a promissory note for the repayment of the sum borrowed.  Id.  In connection with the loan, the Arnolds signed an arbitration agreement which provided for resolution of any and all claims arising out of the loan transaction by binding arbitration.  Id. at 857-858.  In the arbitration agreement, the Arnolds waived their rights to seek relief in a judicial forum, to recover consequential, punitive and treble damages, and to appeal an award rendered by an arbitrator.  Id. at 858.  However, the arbitration agreement

23

allowed United Lending to

> submit and to pursue in a court of law any
> actions related to the collection of the
> debt; . . . foreclosure proceedings . . .,
> proceedings pursuant to which Lender seeks a
> deficiency judgment, or any comparable
> procedures allowed under applicable law
> pursuant to which a lien holder may acquire
> title to the Property which is security for
> this loan and any related personal property .
> . . upon a default by the Borrower under the
> mortgage loan documents . . .; or . . . an
> application by or on behalf of the Borrower
> for relief under the federal bankruptcy laws
> . . ..

Id. at 858.  The court found that, under the arbitration

provision, "United Lending's acts or omissions could seriously

damage the Arnolds," and the Arnolds' "only recourse would be to

submit the matter to binding arbitration."  Id. at 861.  "At the

same time, United Lending's access to the courts is wholly

preserved in every conceivable situation where United Lending

would want to secure judicial relief against the Arnolds."  Id.

The court held that the Arnolds' waiver of rights together with

the complete preservation of United Lending's rights was

"inherently inequitable and unconscionable."  Id. at 861-862.

    Also significant to the court's decision in Arnold was

the fact that United Lending was a national lending institution

24

and the Arnolds were elderly, uneducated consumers.[3]  511 S.E.2d
at 861.  The court further noted that the Arnolds did not seek
the loan, but were solicited at their home by a loan broker, and
that the loan broker did not provide them with any meaningful
alternatives.  Id.  Based upon these circumstances, the court
found the Arnolds' bargaining position "clearly inadequate."  Id.
Thus, in Arnold, the borrower's clearly inadequate bargaining
position and waiver of access to the courts where the lender
retains such access, coupled with a substantial waiver of a
borrower's rights, rendered the arbitration agreement
unconscionable and unenforceable.  More particularly, Arnold
holds that "where an arbitration agreement entered into as part
of a consumer loan transaction contains a substantial waiver of
the borrower's rights, including access to the courts, while
preserving the lender's right to a judicial forum, the agreement
is unconscionable and, therefore, void and unenforceable as a
matter of law."  Arnold, 511 S.E.2d at 862.[4]

---

[3]Mr. Arnold, 69 years old, had a fifth grade education; Mrs.
Arnold, 63 years old, had an eighth grade education.  Arnold at
861, n.7.

[4]Pursuant to Doctor's Associates, Inc. v. Casarotto, 517
U.S. 681, 687 (1996), courts may not invalidate arbitration
agreements under state laws applicable only to arbitration
provisions; rather, arbitration provisions must be placed on the
same footing as other contracts and states may not single out
arbitration provisions for suspect status.  Nevertheless, the

25

### c.   Analysis

### 1.   Validity of Arbitration Agreement, In Its Entirety

In this case, the court does not agree with plaintiffs that the Arbitration Riders, in their entirety, are unlawful contracts of adhesion or are procedurally and substantively unconscionable.  While reason dictates that the bargaining power of consumers and commercial lenders is unequal, plaintiffs' bargaining position in this case can hardly be characterized as "grossly inadequate."  Neither plaintiff has alleged that they are illiterate or were unable to read the documents presented to them at closing; in fact, the testimony of plaintiff Kathy Miller indicates that despite having the ability to read the documents, plaintiffs affirmatively chose not to avail themselves of the opportunity.[5]  (See K. Miller Depo. at 64-65, 96, 97, 101-103.) Moreover, plaintiffs had the opportunity to read the arbitration agreement immediately following the closing when they returned home with a copy of the loan documents but, according to Ms. Miller, she and her husband simply chose to skim the documents

Arnold opinion merits consideration with respect to the application of the doctrine of unconscionability to consumer arbitration agreements in West Virginia.

[5]Ms. Miller specifically testified that she had a high school education and that she can read.  (K. Miller Depo. at 5.)

26

and not read them.  (Id. at 32, 69-70.)  Plaintiffs have failed
to identify any conduct on the part of the closing agent, Bonnie
Sue Tichenor, that prevented them from reading and reviewing the
loan documents, including the Arbitration Riders.  Rather, Ms.
Miller conceded that neither she nor her husband asked Ms.
Tichenor to explain the loan documents or requested that Ms.
Tichenor provide them with additional time to read the documents
prior to signing.  (Id. at 22, 65-66.)  While Ms. Miller
indicates that Ms. Tichenor was in a hurry when conducting the
closing, she did not testify concerning any specific behavior on
the part of the closing agent that interfered with the ability of
her husband and herself to inform themselves of the contents of
the documents.  (See id. at 17-18.)  Ms. Miller also testified
that she understood that by signing the loan documents, she and
her husband were agreeing to the documents and their contents.
(Id. at 64-65.)

        While plaintiffs emphasize the lack of professionalism
on the part of Ms. Tichenor at the closing, both with respect to
the location of the closing itself, a McDonald's restaurant, and
Ms. Tichenor's conduct, plaintiffs have failed to produce
evidence that the alleged lack of professionalism prevented them
from meaningfully reviewing the material with which they were

presented or from understanding the implications of their actions in signing the loan documents.  Although plaintiffs claim that the lack of professionalism made them "feel uncomfortable," there is no evidence that they did not understand the significance of the transaction into which they were entering.  Contrary to plaintiffs' suggestion, Ms. Tichenor was under no duty to orally explain the terms of the contract.  See Adkins, 185 F. Supp.2d. at 638 (S.D. W. Va. 2001), aff'd at 303 F.3d 496 (4th Cir.) ("there is no requirement that the more sophisticated party to a contract offer the less sophisticated party an oral explanation of the terms of the contract").  Nonetheless, Ms. Miller's own testimony shows that she and her husband understood what was occurring at the closing from prior loan closings in which they had participated.  (K. Miller Depo. at 64-66.)  Moreover, plaintiffs allege that the loan documents presented by Ms. Tichenor were backdated to reflect a closing on July 23, 1999, when the actual closing occurred on July 24, 1999.  (Complaint at ¶ 10(e).)  However, in her deposition, Ms. Miller acknowledged that had the documents been misdated, she would have indicated as much at the closing.  (K. Miller Depo. at 19-20, 62-63.)  Ms. Miller further conceded that many of the dates found on the closing documents were written in by her and her husband and that those dates reflect that the closing occurred on July 23, 1999.

28

(Id. at 102-106, 109-113.)  While Ms. Miller claims to have no idea what arbitration is, her testimony remains clear that she and her husband were presented with the "Arbitration Riders" during the loan closing and that, despite having the opportunity to read the documents, they failed to do so, mindful of the fact that by signing the documents they were agreeing to the terms stated therein.  (See id. at 64-65, 96-98.)

Nor can the court find that, in general, the terms of the arbitration agreement are so one-sided as to be unconscionable.  While plaintiffs contend that the agreement permits defendants to pursue "certain significant remedies [in court], but requires the consumer to submit all claims to binding arbitration" (Pls' Supp. Memo in Opposition to Mot. to Compel Arbitration at 26), the agreement itself establishes that such an assertion is untrue.  (See Equifirst's Mot. to Compel Arbitration at Exh. 1, Arbitration Riders.)  Under the agreement, the lender defendants retain access to a judicial forum only for foreclosure and, of course, bankruptcy proceedings.[6]  (Id.)  The lender

---

[6]This case is factually distinguishable from Arnold where the defendant alone retained virtually full right of access to court for all purposes of debt collection, including the right to pursue a deficiency judgment.  511 S.E.2d at 858.  Plaintiffs' reliance on Arnold is thus misplaced.  See Gill v. Jim Walter Homes of Louisiana, Inc., 187 F. Supp.2d 618, 622 (W.D. La. 2002) (agreement to arbitrate did not lack mutuality of obligation

defendants would be required to arbitrate all other claims pursued against plaintiffs, including any deficiency claims.  The exception for proceedings related to foreclosure is one that is not only common in arbitration agreements of this kind but quite necessary in order to effectuate foreclosure and a retaking of the subject property by lawful process, where needed, without breach of the peace.  Considering the totality of the circumstances in this case, as a matter of law such a retention of rights by Equifirst is not so inherently unfair and one-sided as to render the arbitration agreements unenforceable on those grounds and a trial is unnecessary to resolve the question of unconscionability.

> ### 2.  Governance of the Code of Procedure of the National Arbitration Forum ("NAF")

Plaintiffs specifically challenge the neutrality of the NAF, from whom, according to the arbitration agreements, the arbitrator must be selected, and the fairness of the procedures

---

where defendant reserved the right to commence litigation in limited number of circumstances including a suit to remedy foreclosure and collect sums due owing under the contract inasmuch as agreement "did not provide defendant with carte blanche power to disregard the arbitration clause and file suit for any reason"); In re Hicks, 285 B.R. 317, 320 (Bkrtcy. W.D. Okla. 2002)("the Court does not view the fact that mortgage foreclosure claims are expressly excluded from the disputes covered by the Arbitration Agreement as particularly sinister").

30

employed by the NAF, to which plaintiffs would be bound.
Plaintiffs also argue that arbitration would prevent them from
pursuing the declaratory and injunctive relief sought in the
complaint, and also from pursuing the class claims that are
alleged.

Each of the Arbitration Riders at issue in this case
states as follows:

> [t]his arbitration agreement is made pursuant
> to a transaction involving interstate
> commerce, and shall be governed by the
> Federal Arbitration Act (9 U.S.C. Sections 1-
> 16) and the Code of Procedure of the National
> Arbitration Forum in effect at the time a
> claim is filed.

(Equifirst's Mot. to Compel Arbitration at Exh. 1, Arbitration
Riders.)  Thus, according to the agreement, plaintiffs not only
agree to arbitrate all claims against defendants, but they agree
to be bound by the Code of Procedure of a particular arbitral
forum -- the NAF.

In attacking the NAF Code of Procedure at issue,
plaintiffs contend that, under NAF procedures, they would be
prohibited from adjudicating the class claims alleged by
plaintiffs and from obtaining any declaratory and injunctive
relief.  (Pls' Supp. Memo. in Opposition to Mot. to Compel

31

Arbitration at 3.)  Plaintiffs also note that Rule 34C of the NAF
Code of Procedure requires that arbitration proceedings be
confidential and argue that such confidentiality will keep the
breadth of defendants' illegal scheme from being disclosed
publicly.  (Id.)  Most significantly, however, plaintiffs assert
that the arbitration agreement is unlawful inasmuch as it
mandates arbitration before the NAF, a "lender-chosen decision-
maker" which is biased in procedure and results toward the
lender.  (Id.)  Plaintiffs argue that the NAF is a for-profit
organization and that arbitrators serving the NAF are paid on a
fee-per-case basis -- meaning that the arbitrators only get paid
if they hear a case.  (Id. at 6-7.)  Under the NAF Code of
Procedure, the parties are required to select an arbitrator from
a list of individuals approved and pre-selected by the NAF which,
according to plaintiffs, "almost always results in a very lender-
oriented arbitrator."  (Id. at 7.)  Before considering the
validity of plaintiffs' claims concerning the limitations on
their remedies, the court looks to plaintiffs' allegation of
bias.

          In support of their claims concerning the impartiality
of the NAF and its Code of Procedure, plaintiffs submit
deposition testimony from various individuals, including Edward

32

C. Anderson, the managing director of the NAF, as well as copies of marketing material distributed to lenders by the NAF in which the NAF advertises its services.  (Pls' Supp. Memo. in Opposition to Mot. to Compel Arbitration at Exh. 1.)  Plaintiffs specifically direct the court to the NAF's promises to lenders of private proceedings, consolidation of cases only by consent of the parties, limitations on remedies and discovery, and the awarding of costs to the prevailing party.  (Id. at 7 and Exh. 1.)  Plaintiffs also challenge the mechanics of the NAF's system of selecting an arbitrator, arguing that the system of strikes utilized by the NAF would inevitably result in a lender-friendly arbitrator, named by NAF's managing director.  (Id. at 7 n.12.)  Additionally, plaintiffs assert the NAF's fee-per-case system creates an incentive for NAF arbitrators to rule in favor of lenders in order to garner repeat business.  (Id. at 8.)  Plaintiffs contend that the NAF, in its solicitation materials, flaunts its close ties to the financial service industry and to lawyers that routinely represent the industry.  (Id.)  Plaintiffs also observe that the NAF has filed affidavits and briefs as amicus curiae supporting lender's arguments in a number of cases, and that it offered assistance to counsel for defendant in the case of Toppings v. Meritech Mortgage Services, Inc., 569 S.E.2d

33

149 (W.Va. 2002).[7]  (Id. at 9-10 n.19.)

        Defendant Equifirst submitted supplemental authority in
support of its motion to compel arbitration, including the June
1, 2001, NAF Code of Procedure, which would govern the parties'
dispute if this case were ordered to arbitration pursuant to the
Arbitration Riders as executed.[8]  With its supplemental briefing,
Equifirst details the main differences between the 2001 Code of
Procedure and the 1996 Code of Procedure, which had been relied
upon by plaintiffs in challenging the enforcement of arbitration.
Defendants note Rule 21 of the Code of Procedure which governs
the selection of arbitrators.  According to the rule, the

_____

        [7] With respect to the NAF's alleged assistance provided the
defendant in the Toppings case, plaintiffs contend that the NAF
offered an affidavit supporting the enforcement of an arbitration
clause mandating arbitration before the NAF, and which
specifically identified respected West Virginia lawyers who were
purportedly available as NAF arbitrators.  (Pls' Supp. Memo. in
Opposition to Mot. to Compel Arbitration at 9-10 n.19.)
Plaintiffs contend that of those identified by the NAF, including
West Virginia University Professor Charles DiSalvo, former West
Virginia Supreme Court of Appeals Justice Thomas McHugh, and
attorney Martin Glasser, none of the individuals knew they were
being designated as NAF arbitrators.  (Id.)  Plaintiffs submit a
July 5, 2001, letter from Charles DiSalvo to Edward C. Anderson
in which Professor DiSalvo states that he is not an arbitrator
available through the NAF and requests that the NAF immediately
cease the misrepresentation that he is associated with its
organization.  (Id. at Exh. 1, Attach. 14.)

        [8] The Arbitration Riders provide for arbitration in
accordance with the Code of Procedure of the NAF "in effect at
the time a claim is filed."  See infra, pgs. 30-31.

director of the NAF provides the parties with a list of
arbitrators equal to the total number of the parties, plus one
additional.  (NAF Code of Procedure Rule 21.)  Within ten (10)
days, each party may exercise one peremptory strike of any
arbitrator on the list for any reason.  (<u>Id.</u>.)  Any arbitrator
may be disqualified at any time for cause under Rule 23 of the
Code of Procedure.[9]  (<u>Id.</u>.)  Equifirst also points out

---

[9] Rule 23 of the NAF Code of Procedure states in its
entirety as follows:

> A.  An Arbitrator shall be disqualified if
> circumstances exist that create a conflict of
> interest or cause the Arbitrator to be unfair
> or biased, including but not limited to the
> following:
>
>> 1.  The Arbitrator has a personal bias
>> or prejudice concerning a Party, or
>> personal knowledge of disputed
>> evidentiary facts;
>>
>> 2.  The Arbitrator has served as
>> an attorney to any Party, the
>> Arbitrator has been associated
>> with an attorney who has
>> represented a Party during
>> that association, or the
>> Arbitrator or an associated
>> attorney is a material witness
>> concerning the matter before
>> the Arbitrator;
>>
>> 3.  The Arbitrator, individually
>> or as a fiduciary, or the
>> Arbitrator's spouse or minor
>> child residing in the

Arbitrator's household, has a
direct financial interest in a
matter before the Arbitrator;

4.    The Arbitrator or the
Arbitrator's spouse, or a
person within the third degree
of relationship to either of
them, or the spouse of such a
person:

   a.    Is a Party to the
proceeding, or an
officer, director, or
trustee of a Party; or,
   b.    Is acting as a lawyer or
representative in the
proceeding.

B.  An Arbitrator shall disclose to the
Director circumstances that create a conflict
of interest or cause an Arbitrator to be
unfair or biased.  The Director shall
disqualify an Arbitrator or shall inform the
Parties of information disclosed by the
Arbitrator if the Arbitrator is not
disqualified.

C.  A Party may request the disqualification
of an Arbitrator by filing with the Director
a written Request stating the circumstances
and specific reasons for the
disqualifications.

D.  A Request to disqualify an Arbitrator
must be filed with the Director within ten
(10) days of receipt of the notice of the
selection.

E.  The Director shall promptly review the
Request and shall disqualify the Arbitrator
if there exist circumstances requiring

provisions under the Code of Procedure which govern discovery (Rule 29), reopening and reconsideration (Rule 39), and waiver of prepaid hearing fees (Rule 45).  Equifirst also directs the court to the decision of the United States Supreme Court in <u>Green Tree Financial Corp. - Alabama v. Randolph</u>, 531 U.S. 79 (2000), in which Justice Ginsburg, in an opinion concurring in part and dissenting in part, mentions the NAF as an example of a national arbitration organization that has developed a consumer-protective fee arrangement for fair arbitration cost and fee allocation. <u>See Green Tree Financial Corp. - Alabama</u>, 531 U.S. at 95 n.2. While Justice Ginsberg mentioned the NAF's system of fee arrangement, the Court's majority opinion does not otherwise discuss the fairness and impartiality of the NAF or its Code of Procedure.

        In the case of <u>Toppings v. Meritech Mortgage Services</u>,

---

disqualification in accord with Rule 23A or other circumstances creating bias or the appearance of bias.

F.  If an Arbitrator is disqualified or becomes unable to arbitrate before the issuance of an Award, the Director shall select a new Arbitrator or panel or re-schedule the hearing, unless the Parties agree otherwise.

(NAF Code of Procedure Rule 23.)

Inc., 569 S.E.2d 149 (W. Va. 2002), the Supreme Court of Appeals

of West Virginia had occasion to consider the NAF as the chosen

arbitral forum identified in a compulsory consumer arbitration

clause and responded to the following question regarding

unconscionability, certified to the court by the Circuit Court of

Lincoln County, West Virginia:

> Whether a lender's form compulsory
> arbitration clause or rider, which mandates
> that all disputes arising out of a consumer
> transaction be submitted to a lender-
> designated decision maker compensated through
> a case-volume fee system whereby the decision
> maker's income as an arbitrator is dependent
> on continued referrals from the creditor, so
> impinges on neutrality and fundamental
> fairness that it is unconscionable and
> unenforceable under West Virginia law.[10]

569 S.E.2d at 149.  Without analysis, the Toppings decision

concludes that, in light of the court's discussion at footnote 12

in State ex rel. Dunlap v. Berger, 567 S.E.2d 265 (W.Va. 2002),

---

[10]The certified question the West Virginia Supreme Court
received and answered in Toppings was imprecisely phrased.
Whereas the certified question stated the dispute was to "be
submitted to a lender-designated decision maker," the state
circuit court's order certifying the question noted that the
arbitration rider required the dispute "'to be resolved by a
binding arbitration by an arbitrator designated by the National
Arbitration Forum and the procedures of the National Arbitration
Forum ("NAF").'" (Order Certifying Question, attached as Exh. 21
to Pls' Supp. Memo.)  Accordingly, it was not the lender that
designated the decision maker; rather, the dispute was to be
resolved by an arbitrator designated by the NAF.

the certified question must be answered in the affirmative.[11]

<u>Id.</u>

The court begins by noting that while <u>Toppings</u>, relying on <u>Dunlap</u>, appears to have addressed a question near that presented in this case, it has been recognized that West Virginia Supreme Court decisions, such as <u>Dunlap</u>, cannot abrogate United States Supreme Court authority.  As the United States Court of Appeals for the Fourth Circuit has stated

> West Virginia precedent generally barring state claims from arbitration must be necessarily circumscribed in light of [the United States Supreme Court's decisions in] <u>Perry</u>, <u>Gilmer</u> and <u>Circuit City</u>.  To the extent that <u>Dunlap</u> intends to fashion a broad prohibition against the arbitrability of state-law claims, such a ruling, whether dicta or otherwise, cannot contravene the FAA.

<u>Wood</u>, 429 F.3d at 90-91.

---

[11]At footnote 12 in the case of <u>State ex rel. Dunlap</u>, the court observed as follows:

> We have held that an impermissible structural unfairness in a tribunal, be it judicial or arbitral, would be presumed where the decision-maker is designated by one of the parties to a dispute and where the person making the decisions is compensated on a fee-per-case basis.

567 S.E.2d at 280 n.12 (internal citations omitted).

Well prior to the West Virginia Supreme Court's decisions in <u>Dunlap</u> and <u>Toppings</u>, the United States Supreme Court dismissed speculative arguments, similar to those asserted by plaintiffs in this case, that any arbitrator selected would be biased.  In <u>Gilmer v. Interstate/Johnson Lane Corp.</u>, 500 U.S. 20, 30-31 (1991), the Court explicitly rejected "'the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators.'" <u>Id.</u> at 30 (quoting <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.</u>, 473 U.S. 614, 634 (1985)).

The Court observed that there were adequate protections under the arbitration rules governing the selection and arbitration of that matter to ensure the selection of a neutral arbitrator.  <u>Id.</u>  It noted that the rules governing arbitration of the dispute provided, much as NAF rules do here, that (1) the parties be informed of the employment histories of potential arbitrators and that the parties further be allowed to make inquiries into the arbitrators' backgrounds; (2) in the arbitrator selection process each party was allowed one peremptory removal of a potential arbitrator and unlimited challenges for cause; and (3) arbitrators were required to disclose "any circumstances which might preclude them from

40

rendering an objective and impartial determination."  The Court
further recognized the FAA protects against arbitrator bias
inasmuch as it "provid[es] that courts may overturn arbitration
decisions `[w]here there was evident partiality or corruption in
the arbitrators.'"  Id. at 30 (quoting 9 U.S.C. § 10(b)).

Plaintiffs' speculative arguments in this case that the
NAF is biased and its rules will not result in the appointment of
an unbiased arbitrator represent little more than "general
antipathy to arbitration" which both the United States Supreme
Court and the Fourth Circuit have rejected.  Wood, 429 F.3d at
90.  Like the rules governing the arbitration in Gilmer, under
the NAF's Code of Procedure (1) prior to the selection of the
arbitrator the names and qualifications of potential arbitrators
are provided to the party; (2) the arbitrator is required to be
"neutral and independent" and disclose any circumstances that
might constitute a conflict of interest or cause the arbitrator
to be unfair or biased; and (3) in the arbitrator selection
process each party has one peremptory challenge and unlimited
challenges for cause.  (Rules 20, 21, and 23 of the National
Arbitration Forum Code of Procedure, Attached as Exh. A to
Equifirst's. Supp. to Mot. to Compel/Dismiss.)  As the Court in
Gilmer noted, should the arbitrator demonstrate partiality,

**41**

plaintiffs could make a post-arbitration request that the arbitrator's award be vacated under the FAA.  See also, Doctor's Associates, Inc. v. Stuart, 85 F.3d 975, 981 (2nd Cir. 1996)(without going through the arbitration process, a party cannot show bias by arbitration organization based on the amount of business received from a party).

        The parallels between the rules governing the arbitration in Gilmer and the rules governing this arbitration cannot be ignored.  Plaintiffs' allegations of bias have been addressed in a number of reported decisions in which similar suggestions that the NAF or the arbitrators it provides are biased have been summarily dismissed.  See Hutcherson v. Sears, Roebuck & Co., 793 N.E.2d 886, 898 (Ill. 2003) (recognizing that under NAF Code of Procedure both parties are involved in the arbitrator selection process and, accordingly, plaintiffs were unable to demonstrate how the arbitrator selection process favors one side); Bank One, N.A. v. Coates, 125 F. Supp.2d 819, 835 (S.D. Miss. 2001), aff'd, 2002 WL 663804 (5th Cir. 2002) ("the rules governing the conduct of NAF arbitrations belie defendant's speculation that suspected bias by the NAF has any realistic potential for affecting decisions of arbitrators in NAF arbitrations"); Marsh v. First USA Bank, N.A., 103 F. Supp.2d

**42**

909, 925 (N.D. Tex. 2000)(following the reasoning of the Court in
Gilmer and noting that "[p]laintiffs' accusations of bias are
directed toward [the] NAF, not the independent arbitrators who
actually conduct the arbitration").

Plaintiffs also maintain that Hooters of America, Inc.
v. Phillips, 173 F.3d 933 (4th Cir. 1999) lends support to their
position; however, the arbitrator selection process in this case
is far from the "sham [arbitration] system" in Hooters where the
arbitration agreement gave the employer "unrestricted control"
over the appointment of the arbitrators.  Id. at 939.  In Hooters
the arbitrators were selected from a list provided by the
employer, and the employer could include on the list arbitrators
who had existing financial or familial ties to the employer and
could even include the employer's managers.  Id.  Moreover, the
employer was not prohibited from punishing arbitrators who ruled
against the company.  Id.  None of the egregious features of the
arbitrator selection process in Hooters can be found in the
arbitrator selection process under the NAF's Code of Procedure.
See Sydnor v. Conseco Financial Servicing Corp., 252 F.3d 302,
306 (4th Cir. 2001)("our decision in Hooters provides guidance on
the limited circumstances in which a court may find an
arbitration agreement unconscionable").  In stark contrast to

43

_Hooters_, both the plaintiffs and the lender defendants participate in the selection of the arbitrator and, as discussed _supra_, there are adequate mechanisms in place under the NAF's Code of Procedure to ensure that the parties will ultimately select a neutral arbitrator.  _Hooters_ is thus of no assistance to plaintiffs.

The court also observes that the filing by NAF of amicus curiae briefs supporting parties that seek to arbitrate disputes is not evidence of the NAF's inability to provide an impartial arbitrator.  NAF is in the arbitration business and it is no surprise that its interests would coincide with that of a party seeking to enforce an arbitration agreement.  The NAF's self-interested behavior in this respect does not indicate that the potential arbitrators it designates are incapable of rendering an impartial decision.

Accordingly, the court concludes that, while the fee factor is cause for some concern, plaintiffs are unable to demonstrate that the NAF, the potential arbitrators it designates, or the arbitrator selection process impinge on neutrality and fundamental fairness such that it would render the Arbitration Riders unconscionable.

**44**

### 3. <u>Declaratory, Injunctive and Class Action Relief</u>

The court next turns to plaintiffs' suggestion that the arbitration agreement is unconscionable since it precludes declaratory, injunctive, and class action relief.

Plaintiffs provide no support for their assertion that declaratory and injunctive relief are unavailable to them were this matter to proceed to arbitration. In fact, it appears that the opposite is true. There is nothing in the arbitration agreement that would prohibit an arbitrator from awarding declaratory or injunctive relief, though resort to a court may be required for enforcement. Indeed, under the applicable NAF rules, an arbitrator "may grant any remedy or relief allowed by applicable substantive law," which would presumably include both declaratory and injunctive relief. (Rule 20(D) of the NAF Code of Procedure, Attached as Exh. A to Equifirst's. Supp. to Mot. to Compel.) Plaintiffs' contention that declaratory and injunctive relief are unavailable thus lacks factual support. <u>See</u> <u>United Electrical Radio & Machine Workers v Honeywell, Inc.</u>, 522 F.2d 1221 (7th Cir. 1975)(arbitrator would be allowed flexibility in formulating remedies, including injunctive relief, where there was contract binding parties to arbitration and where contract

**45**

was not explicit concerning proper remedy and did not prohibit
arbitrator's use of remedies).

Also, while the Arbitration Riders contain a provision
that prohibits the plaintiffs from seeking class action relief,
such a provision is nonetheless enforceable.  It has been so held
by this court and the Fourth Circuit in Adkins.  185 F. Supp.2d.
at 638, aff'd at 303 F.3d 496 (4th Cir.)  Moreover, in the Dunlap
case relied upon by plaintiffs, the plaintiff waived his ability
to seek punitive damages and assert a high volume/low dollar
class action claim in arbitration.  Id. at 278.  The West
Virginia Supreme Court, noting the importance of these two forms
of relief and the exculpatory effect of enforcement of the
waiver, found the waiver of plaintiff's ability to seek punitive
damages and assert a class action claim in those circumstances to
be "clearly unconscionable."  Id. at 280.  However, a federal
district court in West Virginia has distinguished Dunlap and
upheld an arbitration agreement in which a plaintiff waived his
right to assert a class action claim.  Schultz v. AT&T Wireless
Services, Inc., 376 F. Supp.2d 685, 689-92 (N.D. W. Va.
2005)(Stamp, J.).

In Schultz, the court noted that Dunlap involved a

**46**

plaintiff consumer seeking to assert a high volume/low dollar

class action consumer claim and that these types of claims are

effectively addressed in the form of a class action suit.  Id. at

690.  Inasmuch as the plaintiff consumer in Shultz was not

asserting a high volume/low dollar claim, but instead sought to

recover an amount in excess of $75,000.00, the district court

found that the plaintiff could "effectively and cost-efficiently

vindicate his rights through arbitration" such that the class

action waiver did not have the exculpatory effect it did in

Dunlap.  Id.  The court thus found the holding in Dunlap was not

implicated and plaintiff's waiver of the right to pursue a class

action claim was not unconscionable.[12]  Id.

---

[12]The court in Shultz also found that even if the holding in
Dunlap was implicated, the FAA preempts Dunlap to the extent it
would invalidate plaintiff's waiver of the right to pursue class
action relief.  Id. at 691 (citing Merrill Lynch, Pierce, Fenner
& Smith, Inc. v. Coe, 313 F. Supp.2d 603 (S.D. W. Va.
2004)(Faber, J.)).  This finding appears to have merit; however,
inasmuch as this case is factually distinguishable from Dunlap,
the court does not address the preemption issue as it relates to
plaintiffs' waiver of the right to pursue class action relief.
It is also worthy of mention that there are a number of decisions
from federal courts of appeal, including the Fourth Circuit, in
which the waiver of the right to proceed by class action in the
context of an agreement to arbitrate has been upheld.  Adkins,
303 F.3d 503 (upholding this court's decision that plaintiff's
inability to pursue class action relief in an arbitration
proceeding did not render the arbitration agreement invalid);
Snowden v. CheckPoint Check Cashing, 290 F.3d 631, 638 (4th Cir.
2002)(rejecting argument that arbitration agreement was
unenforceable due to inability to bring class action); Randolph

Here, plaintiffs are not asserting a high volume/low dollar claim; rather, review of plaintiffs' 14-count complaint indicates that they, like the plaintiff in Shultz, are seeking a substantial amount of damages and the waiver of the right to pursue a class action claim does not have an exculpatory effect insofar as plaintiffs can effectively vindicate their rights without the use of the class action vehicle.

Accordingly, for all of the reasons above noted and the applicable precedent of the Fourth Circuit, the court finds the holding in Dunlap is not persuasive here and plaintiffs' waiver of the right to pursue class action relief is not unconscionable. Plaintiffs may pursue their claims only in their individual capacities and not as class representatives or members.

The court, having found plaintiffs' arguments in opposition to arbitration to be without merit, concludes the Arbitration Riders, in their entirety, are valid.

---

v. Green Tree Financial Corp., 244 F.3d 814, 818 (11th Cir. 2001) (parties can contractually waive right to proceed via class action); Johnson v. West Suburban Bank, 225 F.3d 366 (3rd Cir. 2000)(rejecting contention that arbitration agreement was unenforceable because the agreement prohibited the maintenance of a class action claim under the Truth in Lending Act).

48

### 4. Community Home Mortgage and Community Bank

The court next addresses the arguments set forth by Community Home Mortgage and Community Bank.  Community Home Mortgage contends that plaintiffs must arbitrate their claims asserted against it inasmuch as under the Arbitration Riders, plaintiffs agreed to arbitrate "[a]ny claim, dispute, or controversy (whether in contract, tort or otherwise) arising from or related to the loan evidenced by the Note" and plaintiffs' claims against Community Home Mortgage 'arise from or relate to' the loan.

By way of brief filed on August 24, 2001, Community Bank insists that should the court determine that the Arbitration Riders are enforceable, the court must then hold a hearing to determine whether Community Home Mortgage was acting as an agent of Community Bank in connection with plaintiffs' loan from Equifirst.  According to Community Bank, should the court determine that Community Home Mortgage was not acting as its agent, then plaintiffs do not have any claim to pursue against Community Bank; however, should the court determine that Community Home Mortgage was acting as its agent, the plaintiffs' claims against Community Bank are necessarily subject to the

49

Arbitration Riders.  Community Bank devotes the remainder of the
brief to its argument that Community Home Mortgage was not acting
as its agent.  Plaintiffs have not responded to Community Bank's
brief.

Both Community Home Mortgage and Community Bank may
enforce the arbitration agreement.  A signatory to an arbitration
agreement may be estopped from avoiding arbitration if the
intertwined claims test is met.  Long v. Silver, 248 F.3d 309,
320-21 (4th Cir. 2001).  The United States Court of Appeals for
the Fourth Circuit has explained the intertwined claims test as
follows

> 'Existing case law demonstrates that equitable
> estoppel allows a nonsignatory to compel
> arbitration . . . when the signatory [to the
> contract containing the arbitration clause] raises
> allegations of . . . substantially interdependent
> and concerted misconduct by both the nonsignatory
> and one or more of the signatories to the
> contract.' Otherwise, 'the arbitration proceedings
> [between the two signatories] would be rendered
> meaningless and the federal policy in favor of
> arbitration effectively thwarted.'

Brantley v. Republic Mortg. Ins. Co., 424 F.3d 392, 395 –396 (4th
Cir. 2005)(quoting MS Dealer Serv. Corp. v. Franklin, 177 F.3d
942, 947 (11th Cir. 1999) (citations omitted)).  Here,
plaintiffs, signatories to the arbitration agreement, have
alleged substantially interdependent and concerted misconduct by

50

both the nonsignatories, Community Home Mortgage and Community Bank, and a signatory to the arbitration agreement, Equifirst. According to plaintiffs, Community Home Mortgage acted as a broker to solicit loans for Equifirst without disclosing to plaintiffs that it was soliciting loans for Equifirst rather than Community Bank. (Compl. at ¶¶ 17, 18.)  Plaintiffs further assert that Community Home Mortgage breached its fiduciary duty owed to plaintiffs and that Equifirst conspired and agreed with Community Home Mortgage to accept the solicited loans. (<u>Id.</u> at ¶¶ 18, 18(a).)  Additionally, plaintiffs maintain that Community Bank participated in all activities and took overt actions in furtherance of the conspiracy. (<u>Id.</u> at ¶¶ 18(b), 20(a)).  Such allegations constitute interdependent and concerted wrongdoing sufficient to satisfy the intertwined claims test. <u>Grigson v. Creative Artists Agency, LLC</u>, 210 F.3d 524, 527 (5th Cir. 2000)(applying equitable estoppel to permit a nonsignatory defendant to compel the signatory plaintiff to arbitrate where plaintiff alleged concerted wrongdoing between signatory and the non-signatory defendant); <u>Jureczki v. Bank One Texas, N.A.</u>, 75 Fed. Appx. 272, 275 (upholding district court's finding that intertwined claims test was satisfied and observing that "[a]t the heart of each of the [plaintiffs'] claims is the allegation

51

that all Defendants acted in concert to fraudulently withdraw funds from [plaintiffs'] deposit account").

Accordingly, plaintiffs' claims against Community Home Mortgage must proceed in arbitration.  Inasmuch as the other nonsignatory, Community Bank, declines to proceed in arbitration unless it is first found that Community Home Mortgage acted in this matter as its agent, this case as to it shall be held in abeyance until the arbitration is concluded.  If plaintiffs' claims as to Community Home Mortgage fail, the claims against Community Bank will be dismissed.  If plaintiffs establish their claims against Community Home Mortgage, this case can then be reopened for such further proceedings as between the plaintiffs and Community Bank as should then be appropriate.

### III.  <u>CONCLUSION</u>

For the foregoing reasons, it is ORDERED that

(1) Equifirst's supplemental motion to compel arbitration and to stay these proceedings pending arbitration, or, in the alternative, to dismiss, be, and it hereby is, granted to the limited extent it seeks to compel arbitration and dismiss plaintiffs' class action claims and is denied in all other

**52**

respects;

(2) the parties shall conduct the arbitration of this matter between all parties except Community Bank on or before February 15, 2007, and jointly report the results of the arbitration to the court on or before March 1, 2007;

(3) all other proceedings in this action be, and they hereby are, stayed pending the results of the arbitration or until further order of the court; and

(4) this case shall be retired from the active docket of the court until further order of the court.

The Clerk is directed to forward copies of this order to all counsel of record.

DATED: September 5, 2006

John T. Copenhaver, Jr.
United States District Judge